IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

LAWRENCE NORTHERN,

                    Plaintiff,

     v.                                                                OPINION and ORDER

ANTHONY HENTZ, GEORGIA KOSTOHRYZ,                                 19-cv-120-jdp
DEBRA TIDQUIST, LIN KIMPEL,
and TAMMY MAASSEN,

                    Defendants.

Plaintiff Lawrence Northern, appearing pro se, is a prisoner at Jackson Correctional Institution. Northern has hypertension and has long experienced chest pains and other symptoms that he believes are caused by a lack of blood flow to his heart. He contends that defendant prison officials failed to properly treat these problems even though electrocardiograms showed a serious risk to his health. I granted Northern leave to proceed on claims under the Eighth Amendment and Wisconsin medical malpractice law regarding this medical treatment.

I also allowed Northern to proceed on Eighth Amendment and medical malpractice claims against defendant Nurse Lin Kimpel for delaying in scheduling a stress test for him and a First Amendment claim against Kimpel for retaliating against him for complaining about delays in his treatment. But Northern failed to serve Kimpel with the complaint, and he has not suggested that his failure was due to good cause or excusable neglect. Accordingly, I will dismiss Kimpel from the case without prejudice. *See* Fed. R. Civ. P. 4(m).

Defendants have filed a motion for summary judgment on the remaining Eighth Amendment and medical malpractice claims, which I will grant in part because Northern fails

to show that any delay in his medical treatment damaged his heart. But I will direct the parties to supplement their summary judgment materials to address Northern's contention that defendants failed to adequately address his pain.

PRELIMINARY MATTERS

I begin with some preliminary motions.

**A.  Motion for leave to file sur-reply**

Northern has filed a motion for leave to file a sur-reply to defendants' motion for summary judgment, along with a proposed sur-reply responding to defendants' assertion in their reply materials that defendant Anthony Hentz did not directly speak to him when Hentz responded to an emergency call regarding Northern's chest pain. Northern states that Hentz did speak directly to him, but he now adds that even if one credited defendants' version of events, Hentz violated DOC procedures mandating that the on-call nurse speak directly with patients. This court disfavors sur-replies, but because Northern is a pro se litigant and because his sur-reply clarifies his argument about the interaction with Hentz, I will consider it.

**B.  Motion to supplement complaint**

A week before defendants filed their reply brief in support of their motion for summary judgment, Northern filed a motion to supplement his pleading under Federal Rule of Civil Procedure 15(d) and a proposed supplement containing new allegations against defendant Health Services Manager Tammy Maassen, who Northern already contends failed to train medical staff and turned a blind eye to repeated delays in treatment. Dkt. 39 and Dkt. 40. Northern seeks to bring new allegations about a long delay in receiving a telemedicine consultation with a cardiologist after his doctor referred him in July 2021. I will grant

2

Northern's motion and allow him to supplement his complaint with his new allegations. Northern does not plausibly allege that Maassen directly participated in the 2021 delay, and he isn't trying to add a new defendant who did directly participate. Rather, I take him to be saying that this delay was yet another incident showing that Maassen ignores persistent problems with inmates receiving timely care. Despite Northern's relatively late request to supplement his complaint, I will grant his request because it does not prejudice defendants; the new allegations do not change my analysis in this summary judgment opinion. Defendants are free to address the new allegations in their supplemental summary judgment materials.

## UNDISPUTED FACTS

The following facts are undisputed except where noted.

Lawrence Northern is a prisoner at Jackson Correctional Institution. Defendants worked as medical staff there: Debra Tidquist was an advanced practice nurse prescriber; Anthony Hentz and Georgia Kostohryz were "Nurse Clinicians II"; and Tammy Maassen is a nurse who acted as the health services manager.

Northern suffers from chronic hypertension and heart disease. In October 2016, Northern had his first electrocardiogram (EKG), a test measuring a person's electrical heart activity. Northern's EKG included a computer's interpretation of the results. The computer's interpretations here included the statement, "Unconfirmed interpretation—MD should review." Dkt. 24-2, at 86.[1] A medical professional reviews the EKG wave forms and makes the

---

[1] The copy of Northern's medical records that defendants provide is broken into 50-page increments on the docket, *see* Dkt. 24-1 through 24-12, along with two different sets of Bates numbering for the entire 616-page record. My citations to these records are to the page numbers marked using defendants' "Exhibit 500" numbering.

final interpretation of the test results. For this EKG, the computer interpreted Northern's heart activity as "borderline," meaning the borderline of normal. *Id.* The computer also noted "consider ischemia" among other notations. *Id.* Ischemia is a condition in which part of the body (here, the heart) receives reduced blood flow. Ischemia can lead to heart attack, arrhythmia, or heart failure.[2]

Defendant Tidquist reviewed the EKG. Tidquist considered the information noted on the computer printout. Her interpretation of the EKG wave forms was that they were normal; they did not meet the criteria to diagnose Northern as having ischemia or to require referral to a cardiologist.

A couple days later, Tidquist saw Northern for a routine hypertension visit. Tidquist states that Northern had no health complaints at this meeting; Northern states that he did complain of chest pain, headaches, and sensations of heart fluttering, but that Tidquist did not report those concerns in her medical notes. Tidquist stated that his heart exam was "[n]otable for regular rhythm, normal sounds and absence of murmurs, rubs or gallops," and that his hypertension was in good control with medications called hydrochlorothiazide and amlodipine. Dkt. 24-1, at 49. Tidquist states that she discussed the EKG results with Northern; Northern states that she did not. Tidquist determined that it was appropriate to continue the current plan of care and then follow-up with an EKG and labs in six months.

In April 2017, Northern had a second EKG. The computer analysis stated "Abnormal [EKG]" and "consider ischemia." Dkt. 24-2, at 85. Tidquist reviewed the EKG and concluded

---

[2]   https://www.mayoclinic.org/diseases-conditions/myocardial-ischemia/symptoms-causes/syc-20375417 (last visited March 25, 2022).

that it was normal, with no notable change from the previous EKG, and that the results did not meet the criteria to diagnose Northern with ischemia.

Several days later, Tidquist met with Northern. Tidquist again states that Northern had no health complaints at this meeting. Northern disputes this, stating that he told Tidquist that he had recently been experiencing frequent extreme headaches and intermittent episodes of chest pain and heart fluttering but that Tidquist did not report those concerns. Tidquist states that she discussed the EKG results with Northern; Northern states that she did not. Tidquist stated that Northern's hypertension was in "fair to good control." Dkt. 24-1, at 44. Tidquist requested a follow-up in six months and labs prior to that visit. Tidquist noted that Northern had a vitamin D deficiency, and she ended the appointment by telling Northern to "get outside in the sun, exercise, and drink more water." Dkt. 35, ¶ 27. Northern believes that he required much more aggressive treatment for his heart condition.

On July 19, 2017, Northern suffered an acute bout of symptoms that he believes was a "cardiac event." At about 4:30 a.m., Northern awoke with severe chest pain, heart fluttering, and nausea. Northern characterizes the pain as 7 out of 10, periodically spiking to 10. Northern told the duty officer that he thought that he was having a heart attack and to call the Health Services Unit (HSU). Defendant Hentz was the on-call nurse that morning and was not yet at the prison. Hentz received a phone call from Northern's unit at about 5:00 a.m. Defendants say that staff told Hentz that Northern did not appear to be in distress, that he denied needing a nursing visit, and that he was just letting nursing staff know about his problem. Northern disputes this, stating that the duty officer let him speak directly to Hentz on the phone; Northern told Hentz that he was a chronic hypertensive patient and he thought that he was having a heart attack. Hentz asked Northern to describe his symptoms; Northern responded

that his chest pain as 7 out of 10, and that he had nausea and heart fluttering. Hentz said, "there was nothing he could do for him" and that "he should go lay down and relax until HSU opened up at about 6 a.m." *Id.*, ¶ 38.

Shortly after that phone call, Hentz called Northern's housing unit security officer as Hentz drove into work to see if there was any change in Northern's status. The security officer told Hentz that Northern had taken a shower and was back in his cell in no observable distress, with Northern rating his pain as 2 out of 10. Northern disputes this report, stating that he did not take a shower and that he was in severe pain. Hentz asked the officer to have Northern escorted to HSU by wheelchair to be assessed as a precaution.

At about 6:00 a.m., Northern was taken in a wheelchair to HSU where he was seen by defendant Nurse Kostohryz. The parties dispute the details of that meeting. Kostohryz states that Northern presented in no distress. Northern told her that his chest pain started at 5:00 a.m. Northern had increased pain with deep breaths. The cardiac pain was reproducible with deep breaths and palpation, which Kostohryz states is indictive of chest wall pain, not a "cardiac event." He had no shortness of breath. She measured his blood pressure at 156 over 109 and his oxygen level at 98 percent. Northern did not complain of squeezing pressure-type chest pain, heart palpations, or nausea. Northern told Kostohryz that he had been having increased stress because of a death in the family. Kostohryz recommended that Northern talk to psychiatric staff about the death. With his history of hypertension and the stress he was having concerning his family, Northern's vitals were what Kostohryz would expect.

Northern's version of these events is as follows: he told Kostohryz that his chest pain started at 4:30 a.m., not 5:00. He states that he told Kostohryz that his pain radiated to his

jaw and was worsening with nausea, that he complained of squeezing pressure-type chest pain, heart fluttering, nausea, and intense pain, and that he wanted to see a doctor.

Northern also states that his blood pressure reading was higher than what Kostohryz reported: he states that his reading was 191 over 130. But Northern does not explain how he knows that this was the reading. Without proper foundation for this assertion, I will not credit this part of Northern's account.

After assessing Northern, Kostohryz did not think that emergency treatment was necessary; she believed that it was appropriate to have Northern follow up with the advanced care provider (I take her to mean defendant Tidquist) when she arrived later that morning.

But Northern was not seen by Tidquist. Instead, Kostohryz later consulted with Tidquist, telling her that Northern's cardiac pain indicated chest wall pain, not a cardiac event; that Northern's vitals were elevated but expected given the family stress he was experiencing; and that he wasn't sweating and had no shortness of breath, which also could have indicated a cardiac event. Tidquist increased Northern's amlodipine from 5 mg to 10 mg daily and requested that he have blood pressure checks weekly for two months. Several hours after Northern was first seen, he was brought back to HSU to meet with defendant Kostohryz, who notified him of the change in medication. Northern states that he told Kostohryz that he remined in severe pain, but Kostohryz did not perform another evaluation.

About a week later, Tidquist ordered Northern hydrochlorothiazide 25 mg daily for hypertension. The parties do not explain whether Northern's previous prescription for this medication had ended or whether Tidquist was increasing the dosage.

In September 2017, Tidquist saw Northern for a routine hypertension visit. Tidquist states that Northern wanted to have his hydrochlorothiazide decreased because he felt

7

dehydrated, and that he was suffering from headaches. Northern states that he complained of continuing episodes of chest pain, a fast heartbeat, blurred vision, headaches, and feelings of abnormal fatigue, and he reported pain of 6 to 8 out of 10. Northern states that he told Tidquist that he was concerned that his problems were stemming from more than just high blood pressure. Tidquist's treatment plan was to have labs, an EKG, and another hypertension visit in six months.

In late February 2018, Northern submitted a health service request asking to see a doctor for his continuing severe headaches and to be placed on a low-sodium diet. Defendant Nurse Hentz responded, stating that Northern was scheduled to see the nurse practitioner in late March and that current hypertension practice was to have the prisoner self-select low-sodium foods rather than be placed on a specific diet. Hentz also told Northern to submit another request if he wanted a nursing visit sooner than his advanced care provider appointment. Tidquist did not see Northern in late March.

In late April 2018, Northern had a third EKG. Defendant Hentz checked Northern's vitals before the EKG: Northern's pulse was within normal limits, his respiratory rate was normal, and his oxygen level was normal. His blood pressure was checked two different times because it was high, but Hentz did not consider it an emergency because Northern did not appear to be in distress and he did not report any complaints.

The computer analysis stated "Borderline [EKG]" and "consider ischemia." Dkt. 24-2, at 84. This time, Tidquist was concerned about the results. She concluded that further testing was necessary because of an abnormal wave form on one of the EKG leads and because Northern continued to complain of intermittent chest pain. Tidquist ordered Northern an exercise stress test, in which the patient is hooked up to an EKG while he walks or jogs on a

treadmill. She ordered this test to rule out damage to Northern's heart. It was not Tidquist's responsibility to formally schedule the test.

Tidquist also evaluated Northern. Tidquist states that Northern complained of headaches and fatigue but denied shortness of breath or chest pain. He had an elevated blood pressure, 154 over 96. Tidquist examined his heart and noted "regular rhythm, normal sounds and absence of murmurs, rubs or gallops." Dkt. 24-1, at 49. Tidquist discussed the EKG result, stating that it might show that part of Northern's heart was not getting enough oxygen. She assessed him as having hypertension with possible ischemia. Tidquist also started him on metoprolol 25 mg twice a day to treat his elevated blood pressure.

Two weeks later, Tidquist saw Northern for a follow-up visit for his hypertension. Northern reported having chest pain with exercise of less than ten minutes, and headaches. He reported no radiation of the pain to his left arm or jaw. He was in no apparent distress and he denied any chest pain that day. Tidquist told Northern that his diastolic blood pressure was too high, so she increased the previously prescribed metoprolol to 50 mg.

Around that time, Northern learned that the stress test had not yet been scheduled by HSU staff. He filed an inmate grievance about the delay and he won that grievance.

In mid-May 2018, Dr. Lilly Liu (who is not a defendant) took Northern's treatment over from Tidquist, after Liu intervened in sick-call visit with a nurse in which Northern complained of severe headaches, chest pain, and nausea. Liu ordered that Northern receive a stress test in the next two weeks. She discontinued Northern's amlodipine, added that to his allergy list, and replaced it with a blood pressure medication called lisinopril. It took Northern about a week to receive this medication, only after he complained about the delay and continued chest pain and headaches.

9

In June 2018, Northern went to the hospital for the exercise stress test. Part way through, Northern received a nuclear tracer injection to evaluate blood flow to his heart. The doctor conducting the test made the following assessment:

1. Negative, adequate [stress test] with 10 minutes of exercise representing good cardiovascular conditioning;

2. Development of atypical chest pain during exercise that was not associated with EKG changes; and

3. Mild hypertensive response to exercise.

Dkt. 24-2, at 79–80. The doctor interpreting the EKG suggested increasing Northern's dosage of lisinopril and getting Northern to regularly exercise. The doctor noted that further management may be appropriate pending the results of the interpretation of the nuclear tracer part of the test.

The doctor later evaluating the nuclear tracer results concluded that "[m]ild to moderate distal anteroseptal ischemia is suggested by perfusion imaging." *Id.* at 81. Northern states that this doctor told him that he had "'an abnormal and funky' EKG with ischemia, and a defect within his hearts circuit." Dkt. 35, ¶ 109. Northern's account of what this non-defendant doctor said to him is inadmissible hearsay so I will not consider it. But the test results are enough to suggest that Northern may have suffered some loss of blood flow to his heart.

Northern continued to complain of chest pain and headaches, including one instance in which he submitted a health service request requesting a better treatment plan. Defendant Hentz responded, "You had no complaints when I did your blood pressure today," Dkt. 35-23, at 8, which was incorrect—Hentz had noted Northern's earlier complaint. Hentz did not

directly address Northern's request for help, instead stating that he was scheduled to see a doctor later in the month.

A week later, Dr. Liu ordered a "Methacholine Challenge test" to evaluate whether Northern has asthma. But that test was not scheduled by staff, even after Northern complained. He received the test about two months later: it was positive.

In August 2018, Northern was seen by Dr. Ward Brown, a cardiologist at Gundersen Health System for help in evaluation and treatment of Northern's complaints of chest pain. Brown reviewed the stress test results. Brown told Northern that "patients who were able to exercise as well as he did are in the best survival category from an 'ischemic point of view,'" with under a 1 percent chance per year of dying from a heart attack. Dkt. 24-12, at 615. Brown also stated that Northern "very well may have an element of hypertensive heart disease process," that Northern should continue trying to control his hypertension, and that if his pain persists further testing might be necessary. *Id.* at 615–16. Brown stated that Northern should consider adding aspirin to his medication regimen.

In September 2019, Brown saw Northern again. Northern stated that he "'just does not feel well'" with his hypertension, and he complained of intermittent chest pain and headaches. Dkt. 24-6, at 288. Brown examined Northern and concluded he had difficult-to-control hypertension. Brown told Northern that he was "currently on a good medical regimen, noting that it could take up to 5 different agents to bring about adequate blood pressure control." *Id.* at 289. Brown recommended switching Northern's hydrochlorothiazide to chlorthalidone, increasing his dose of another medication called hydralazine, and continuing with his other medications.

Northern states that defendant Health Services Manager Maassen was aware of his complaints about inadequate care and of delays in him receiving medications and appointments, particularly a month delay in him receiving a stress test, a two-month delay in him receiving a Methacholine Challenge test, and at least a several-month delay in receiving a telemedicine consultation with a cardiologist in 2021. But Maassen did nothing to ensure that prisoners received more timely care.

I will discuss additional facts as they become relevant to the analysis.

ANALYSIS

Northern brings Eighth Amendment and Wisconsin-law medical negligence claims against defendants Hentz, Kostohryz, Tidquist, and Maassen for failing to properly treat his heart problems and symptoms associated with it, including severe headaches and chest pain. Northern contends that defendants delayed in properly treating him despite seeing his first two irregular EKG results suggesting that he had an unaddressed heart problem; only after his third EKG 18 months later did Northern receive a stress test and assessments from a cardiologist. Northern contends that the delay in treatment resulted in his heart being damaged and forced him to languish in pain.

The Eighth Amendment prohibits prison officials from acting with conscious disregard toward prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). A medical need is serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering,

12

significantly affects an individual's daily activities, *Gutierrez v. Peters*, 111 F.3d 1364, 1371–73 (7th Cir. 1997), or otherwise subjects the prisoner to a substantial risk of serious harm, *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). A defendant "consciously disregards" an inmate's need when the defendant knows of and disregards "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). However, inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

Under Wisconsin law, a claim for medical malpractice, "as all claims for negligence, requires the following four elements: (1) a breach of (2) a duty owed (3) that results in (4) an injury or injuries, or damages." *Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860.

There is a dispute over the exact medical problems Northern suffered from. It is undisputed that he suffers from hypertension and intermittent chest pain and headaches. But Northern states that defendants delayed in discovering his ischemia, while defendants counter that Northern has not been formally diagnosed with ischemia. Defendants are correct that none of Northern's assessments contain an explicit diagnosis of ischemia. But there is medical evidence suggesting that he suffers from ischemia: Tidquist told him that his third EKG suggested "possible ischemia," the doctor reading the nuclear stress test results concluded that "[m]ild to moderate distal anteroseptal ischemia is suggested," Dkt. 24-2, at 81, and cardiologist Brown told him that he was "in the best survival category from an 'ischemic point of view,'" Dkt. 24-12, at 615.

Regardless the exact nature of Northern's serious medical need, to succeed on his Eighth Amendment claims he must identify evidence that defendants' actions or inactions caused him to be injured. *Lord v. Beahm*, 952 F.3d 902, 905 (7th Cir. 2020). Likewise, to succeed on his negligence claims, Northern must identify evidence that defendants' actions caused him "actual damage." *Hennekens v. Hoerl*, 160 Wis. 2d 144, 465 N.W.2d 812, 816 (1991).

Northern contends that defendants subjected him to the risk of heart attack—particularly during the July 17, 2017 incident in which he asserts that his blood pressure spiked and he suffered extreme chest pain. But there is no evidence that Northern actually did suffer a heart attack during that incident or at any point during the alleged 18-month delay in proper care. The mere exposure to a risk that ultimately fails to materialize is not enough to support his claims. *See Lord*, 952 F.3d at 905 ("risk is not compensable without evidence of injury").

Northern also contends that he suffered heart damage from defendants' delay in treating him properly. I will assume for purposes of this opinion that Northern's potential ischemia noted in the medical records reflects damage or a loss of function in his circulatory system. But even so, there is no evidence that this harm was caused by defendants' alleged delay, or even that the damage occurred during the delay. I take Northern to be arguing that the progression of his ischemia could be seen by his EKGs and his worsening symptoms. But Northern is not qualified to interpret EKGs or explain the cause of his medical problems. *Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001) (nonexpert may not testify regarding cause of medical condition). This is not a case where the medical problem is so glaringly obvious that a jury could find causation without the aid of an expert to explain the medical concepts at issue. *See Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). (Eighth Amendment violated

14

when it "is so obvious that even a lay person would perceive the need for a doctor's attention" but prison staff fail to provide treatment); *see also Gil v. Reed*, 535 F.3d 551, 557–58 (7th Cir. 2008) (concluding that under Wisconsin law expert testimony is not needed to establish the standard of care when a plaintiff "show[s] that an ordinary person could conclude from common experience that he could not have been injured had his medical providers exercised care"). An ordinary lay jury would not know, without expert assistance, when Northern began suffering from the loss of blood flow, what caused the condition to progress, or whether earlier intervention could have prevented it.

One way a plaintiff might show that the delay caused his harm would be to present evidence showing that the delayed treatment would have made a material difference in his condition, such as by correcting a prior misdiagnosis or resolving the problem. Northern does not do that here. Northern received various diagnostic tests and providers continue to try different medications but he continues to suffer from "difficult-to-control hypertension" and he continues to complain of severe chest pain. Dkt. 24-6, at 291. There is no evidence that his current treatment would have prevented damage from ischemia if the treatment had been performed earlier. Northern believes that he'd be in better condition if defendants had taken steps like changing his medication, arranging for a stress test, or sending him to a cardiologist earlier than they ultimately did, but his own belief is nothing more than speculation that defendants could have prevented harm to him. *See, e.g., Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) (While nonmovant "is entitled . . . to all reasonable inferences in her favor, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." (citation omitted)). Because Northern fails to show that defendants' actions or inactions caused damage to the function of his circulatory system, I will

15

grant summary judgment to defendants on this aspect of his Eighth Amendment and medical malpractice claims.

But that still leaves the other aspect of Northern's claims: that regardless whether his heart was damaged, defendants left him to languish in pain. Prolonged severe pain itself is a serious medical need, *Smith v. Knox Cnty. Jail*, 666 F.3d 1037, 1039–40 (7th Cir. 2012), so a deliberate or reckless failure to treat that need can violate the Eighth Amendment, regardless of the treatment of Northern's underlying physical condition. The medical record makes clear that Northern's hypertension and potential ischemia are difficult to treat, but nonetheless, it's possible that his pain could have been treated aside from those underlying maladies.

There are some disputes of fact about precisely how often Northern raised complaints of chest pain, headaches, and other pain associated with his heart problems, but it is undisputed that Northern has repeatedly raised the issue of pain. The parties' summary judgment materials focus on the treatment that Northern received directly aimed at his hypertension or at diagnosing the cause of his symptoms. But they do not really address what treatment of severe chest or headache pain might be appropriate under the circumstances. Northern suggests that defendants should have followed DOC nursing protocols for treating chest pain by providing him aspirin and nitroglycerin, at least for the incident in July 2017 in which he suffered acute chest and jaw pain. But that protocol appears to be intended for emergency events like suspected heart attack. *See* Dkt. 35-8, at 2 ("Chest pain" nursing protocol discussing administration of these drugs under headings titled "IF LIFE THREATENING: Activate EMS. Implement BLS" and "EMERGENCY ACTION for active chest pain."). I have already concluded that Northern fails to show that he suffered a heart attack or other cardiac event during that incident.

Nonetheless, that protocol does suggest that there may be appropriate medical interventions aimed at pain for patients who suffer from the type of problems Northern has. The current record is not complete enough for me to determine whether a trial is necessary to resolve Northern's claims that defendants inadequately addressed his pain. I will deny this aspect of defendants' motion for summary judgment without prejudice. I will give defendants a short time to provide supplemental summary judgment materials addressing their treatment of Northern's pain, and I will give Northern a chance to respond to those submissions.

## ORDER

IT IS ORDERED that:

1. Defendant Lin Kimpel is DISMISSED from the case without prejudice.

2. Plaintiff Lawrence Northern's motion for leave to file a sur-reply, Dkt. 45, is GRANTED.

3. Plaintiff's motion to supplement his complaint, Dkt. 39, is GRANTED. Plaintiff's supplemental pleading at Dkt. 40 is now part of the operative complaint.

4. Defendants' motion for summary judgment, Dkt. 21, is GRANTED in part as discussed in the opinion above.

5. Defendants may have until April 18, 2022, to submit a supplement to their summary judgment materials concerning the treatment of plaintiff's pain. Plaintiff may have until May 2, 2022, to submit a supplement to his summary judgment opposition.

Entered March 28, 2022.

BY THE COURT:

_/s/_____
JAMES D. PETERSON
District Judge