IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

LAWRENCE NORTHERN,

      Plaintiff,

v.                 OPINION and ORDER

ANTHONY HENTZ, GEORGIA KOSTOHRYZ,    19-cv-120-jdp
DEBRA TIDQUIST, and TAMMY MAASSEN,

      Defendants.

---

  Plaintiff Lawrence Northern, appearing pro se, is a prisoner at Jackson Correctional Institution. Northern has hypertension and has long experienced chest pains, severe headaches, and other symptoms that he believes are caused by a lack of blood flow to his heart. He contends that defendant prison officials failed to properly treat these problems even though electrocardiograms showed a serious risk to his health. Northern brings claims under the Eighth Amendment and Wisconsin medical negligence law.

  I previously granted defendants' motion for summary judgment on Northern's claims directly about his heart condition, concluding that Northern failed to present evidence showing that he suffered any heart damage from defendants' treatment decisions. Dkt. 50. But the parties' summary judgment materials did not address the other aspect of Northern's claims: whether defendants properly addressed the pain that Northern states he suffered from his heart problems. I directed the parties to present supplemental summary judgment materials on that issue, which they have done.

  After considering the parties' original and supplemental summary judgment materials, I conclude that there are disputed issues of material fact regarding most of Northern's claims

that defendants inadequately treated his pain. So I will largely deny defendants' motion for summary judgment on those claims, and the case will proceed to trial.

UNDISPUTED FACTS

The following facts are drawn from the parties' original and supplemental proposed findings of fact and are undisputed except where noted.

Lawrence Northern is a prisoner at Jackson Correctional Institution. Defendants worked as medical staff there: Debra Tidquist was an advanced practice nurse prescriber; Anthony Hentz and Georgia Kostohryz were "Nurse Clinicians II"; and Tammy Maassen is a nurse who acted as the health services manager.

Northern suffers from chronic hypertension and heart disease. He says that these problems have caused him "debilitating" headaches and chest pain. Dkt. 64, at 2. In October 2016, Northern had his first electrocardiogram (EKG), a test measuring a person's electrical heart activity. Northern's EKG included a computer's interpretation of the results, which included the notation "consider ischemia." Dkt. 24-2, at 86.[1] Defendant Tidquist reviewed the EKG. Tidquist considered the information noted on the computer printout. Her interpretation of the EKG wave forms was that they were normal; they did not meet the criteria to diagnose Northern as having ischemia or to require referral to a cardiologist.

A couple of days later, Tidquist saw Northern for a routine hypertension visit. Tidquist states that Northern had no health complaints at this meeting; Northern states that he did

---

[1] The copy of Northern's medical records that defendants provide is broken into 50-page increments on the docket, *see* Dkt. 24-1 through 24-12, along with two different sets of Bates numbering for the entire 616-page record. My citations to these records are to the page numbers marked using defendants' "Exhibit 500" numbering.

complain of chest pain, severe headaches, and sensations of heart fluttering, but that Tidquist did not report those concerns in her medical notes. Tidquist stated that his heart exam was "[n]otable for regular rhythm, normal sounds and absence of murmurs, rubs or gallops," and that his hypertension was in good control with medications called hydrochlorothiazide and amlodipine. Dkt. 24-1, at 49. Tidquist states that she discussed the EKG results with Northern; Northern states that she did not. Tidquist determined that it was appropriate to continue the current plan of care and then follow-up with an EKG and labs in six months.

In April 2017, Northern had a second EKG. The computer analysis stated "Abnormal [EKG]" and "consider ischemia." Dkt. 24-2, at 85. Tidquist reviewed the EKG and concluded that it was normal, with no notable change from the previous EKG, and that the results did not meet the criteria to diagnose Northern with ischemia.

Several days later, Tidquist met with Northern. Tidquist again states that Northern had no health complaints at this meeting. Northern disputes this, stating that he told Tidquist that he had recently been experiencing frequent extreme headaches and intermittent episodes of chest pain and heart fluttering but that Tidquist did not report those concerns. Tidquist states that she discussed the EKG results with Northern; Northern states that she did not. Tidquist stated that Northern's hypertension was in "fair to good control." Dkt. 24-1, at 44. Tidquist requested a follow-up in six months and labs prior to that visit. Tidquist noted that Northern had a vitamin D deficiency, and she ended the appointment by telling Northern to "get outside in the sun, exercise, and drink more water." Dkt. 35, ¶ 27. Northern believes that he required much more aggressive treatment for his heart condition.

On July 19, 2017, Northern suffered an acute bout of symptoms that he believes was a "cardiac event." At about 4:30 a.m., Northern awoke with severe chest pain, heart fluttering,

3

and nausea. Northern characterizes the pain as 7 out of 10, periodically spiking to 10. Northern told the duty officer that he thought that he was having a heart attack and to call the Health Services Unit (HSU). Defendant Hentz was the on-call nurse that morning and was not yet at the prison. Hentz received a phone call from Northern's unit at about 5:00 a.m. Defendants say that staff told Hentz that Northern did not appear to be in distress, that he denied needing a nursing visit, and that he was just letting nursing staff know about his problem. Northern disputes this, stating that the duty officer let him speak directly to Hentz on the phone; Northern told Hentz that he was a chronic hypertensive patient and he thought that he was having a heart attack. Hentz asked Northern to describe his symptoms; Northern responded that his chest pain as 7 out of 10, and that he had nausea and heart fluttering. Hentz said, "there was nothing he could do for him" and that "he should go lay down and relax until HSU opened up at about 6 a.m." *Id.*, ¶ 38.

Shortly after that phone call, Hentz called Northern's housing unit security officer as Hentz drove into work to see if there was any change in Northern's status. The security officer told Hentz that Northern had taken a shower and was back in his cell in no observable distress, with Northern rating his pain as 2 out of 10. Northern disputes this report, stating that he did not take a shower and that he was still in severe pain. Hentz asked the officer to have Northern escorted to HSU by wheelchair to be assessed as a precaution.

At about 6:00 a.m., Northern was taken in a wheelchair to HSU where he was seen by defendant Nurse Kostohryz. The parties dispute the details of that meeting. Kostohryz states that Northern presented in no distress. Northern told her that his chest pain started at 5:00 a.m. Northern had increased pain with deep breaths. The cardiac pain was reproducible with deep breaths and palpation, which Kostohryz states is indicative of chest wall pain, similar

4

to a muscle strain, and not a "cardiac event" or a product of hypertension. Northern had no shortness of breath. She measured his blood pressure at 156 over 109 and his oxygen level at 98 percent. Northern did not complain of squeezing pressure-type chest pain, heart palpations, or nausea. Northern told Kostohryz that he had been having increased stress because of a death in the family. Kostohryz recommended that Northern talk to psychiatric staff about the death. With his history of hypertension and the stress he was having concerning his family, Northern's vitals were what Kostohryz would expect.

Northern's version of these events is as follows: he told Kostohryz that his chest pain started at 4:30 a.m., not 5:00. He states that he told Kostohryz that his pain radiated to his jaw and was worsening with nausea, that he complained of squeezing pressure-type chest pain, heart fluttering, nausea, and intense pain, and that he wanted to see a doctor.

After assessing Northern, Kostohryz did not think that emergency treatment was necessary; she believed that it was appropriate to have Northern follow up with the advanced care provider (I take her to mean defendant Tidquist) when she arrived later that morning. Kostohryz believed that the chest wall pain that Northern was suffering could be treated by over-the-counter medication such as acetaminophen or ibuprofen available to Northern through the canteen.

Northern was not seen by Tidquist later that day. Instead, Kostohryz later consulted with Tidquist, telling her that Northern's cardiac pain indicated chest wall pain, not a cardiac event; that Northern's vitals were elevated but expected given the family stress he was experiencing; and that he wasn't sweating and had no shortness of breath, which also could have indicated a cardiac event. Tidquist increased Northern's amlodipine from 5 mg to 10 mg daily and requested that he have blood pressure checks weekly for two months. Tidquist said

5

that she increased Northern's amlodipine for hypertension because bringing blood pressure under control also typically alleviates other symptoms like headaches and chest pain.

Several hours after Northern was first seen, he was brought back to HSU to meet with defendant Kostohryz, who notified him of the change in medication. Northern states that he told Kostohryz that he remined in severe pain, but Kostohryz did not perform another evaluation. Northern states that he was in pain for about 15 hours that day.

About a week later, Tidquist ordered Northern hydrochlorothiazide 25 mg daily for hypertension. The parties do not explain whether Northern's previous prescription for this medication had ended or whether Tidquist was increasing the dosage.

From July through September 2017, Northern was seen multiple times by Hentz or Kostohryz for blood pressure monitoring. He continued to complin of pain but they did not take any action to treat it, instead saying that he had an upcoming appointment with Tidquist.

In late September 2017, Tidquist saw Northern for a routine hypertension visit. Tidquist states that Northern wanted to have his hydrochlorothiazide decreased because he felt dehydrated and that he was suffering from headaches. Northern states that he complained of continuing episodes of chest pain, a fast heartbeat, blurred vision, headaches, and feelings of abnormal fatigue, and he reported pain of 6 to 8 out of 10. Northern states that he told Tidquist that he was concerned that his problems were stemming from more than just high blood pressure. Tidquist's treatment plan was to have labs, an EKG, and another hypertension visit in six months.

In early January 2018 Northern was prescribed Tylenol 325 mg for his complaints of headaches; it is unclear who ordered that medication. He received bottles of Tylenol twice in January. Northern states that each bottle contained about a week's worth of pain medication.

6

But Northern states that his chest pain would "cut through" the Tylenol, leaving him with pain of 5 to 7 out of 10.

In late February 2018, Northern submitted a health service request asking to see a doctor for his continuing severe headaches and to be placed on a low-sodium diet. Defendant Nurse Hentz responded, stating that Northern was scheduled to see the nurse practitioner in late March and that current hypertension practice was to have the prisoner self-select low-sodium foods rather than be placed on a specific diet. Northern received another bottle of Tylenol the day after this visit; I take the parties to be saying that Hentz provided it to him. Hentz also told Northern to submit another request if he wanted a nursing visit sooner than his advanced care provider appointment. Tidquist did not see Northern in late March.

In late April 2018, Northern had a third EKG. The computer analysis stated "Borderline [EKG]" and "consider ischemia." Dkt. 24-2, at 84. This time, Tidquist was concerned about the results. She concluded that further testing was necessary because of an abnormal wave form on one of the EKG leads and because Northern continued to complain of intermittent chest pain. Tidquist ordered Northern an exercise stress test.

Tidquist also evaluated Northern. Tidquist states that Northern complained of headaches and fatigue but denied shortness of breath or chest pain. Northern states that they did discuss chest pain. Tidquist examined his heart and noted "regular rhythm, normal sounds and absence of murmurs, rubs or gallops." Dkt. 24-1, at 36. Tidquist discussed the EKG result, stating that it might show that part of Northern's heart was not getting enough oxygen. She assessed him as having hypertension with possible ischemia. Tidquist also started him on metoprolol 25 mg twice a day to treat his elevated blood pressure and headaches; this medication is used to treat chest pain and high blood pressure but can also be used to prevent

7

headaches and treat anxiety. Tidquist states that this is the first time that Northern told her about ongoing severe headaches. Northern states that he had told her at previous appointments.

Two weeks later, Tidquist saw Northern for a follow-up visit for his hypertension. Northern reported having chest pain with exercise of less than ten minutes, and severe headaches. He reported no radiation of the pain to his left arm or jaw. He was in no apparent distress and he denied any chest pain that day. Tidquist told Northern that his diastolic blood pressure was too high, so she increased the previously prescribed metoprolol to 50 mg. Northern states that the metoprolol did nothing to reduce his pain.

In mid-May 2018, Northern was prescribed another bottle of Tylenol 325 mg by a non-defendant nurse after Northern continued to complain of headaches.

Around that same time, Dr. Lilly Liu (who is not a defendant) took Northern's treatment over from Tidquist, after Liu intervened in a sick-call visit with a nurse in which Northern complained of severe headaches, chest pain, and nausea. Liu ordered that Northern receive a stress test in the next two weeks. She discontinued Northern's amlodipine, added that to his allergy list, and replaced it with a blood pressure medication called lisinopril. Liu also prescribed him ibuprofen 600 mg for his pain; two weeks later she increased the amount of ibuprofen tablets he received in a month.

In June 2018, Northern went to the hospital for the exercise stress test, with a doctor concluding that "[m]ild to moderate distal anteroseptal ischemia is suggested by perfusion imaging." Dkt. 24-2, at 81. Northern continued to complain of chest pain and headaches, including one instance in which he submitted a health service request requesting a better treatment plan. Defendant Hentz responded, "You had no complaints when I did your blood

pressure today," Dkt. 35-23, at 8, which was incorrect—Hentz had noted Northern's earlier complaint. Hentz did not directly address Northern's request for help, instead stating that he was scheduled to see a doctor later in the month. Dr. Liu later prescribed Northern aspirin and Tylenol 650 mg.

Northern states that defendant Health Services Manager Maassen was aware of his complaints about inadequate care and of delays in him receiving medications and appointments, particularly a month delay in him receiving a stress test, a two-month delay in him receiving a Methacholine Challenge test, and at least a several-month delay in receiving a telemedicine consultation with a cardiologist in 2021. But Maassen did nothing to ensure that prisoners received more timely care.

I will discuss additional facts as they become relevant to the analysis.

ANALYSIS

Northern brings Eighth Amendment and Wisconsin-law medical negligence claims against defendants Hentz, Kostohryz, Tidquist, and Maassen for failing to properly treat the pain associated with his heart problems, including severe headaches and chest pain.

The Eighth Amendment prohibits prison officials from acting with conscious disregard toward prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). A medical need is serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily activities, *Gutierrez v. Peters*, 111 F.3d 1364, 1371–73

(7th Cir. 1997), or otherwise subjects the prisoner to a substantial risk of serious harm, *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). Prolonged severe pain—like the pain that Northern alleges that he suffered here—is a serious medical need. *Smith v. Knox Cnty. Jail*, 666 F.3d 1037, 1039–40 (7th Cir. 2012)

A defendant "consciously disregards" an inmate's need when the defendant knows of and disregards "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). However, inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

Under Wisconsin law, a claim for medical malpractice, "as all claims for negligence, requires the following four elements: (1) a breach of (2) a duty owed (3) that results in (4) an injury or injuries, or damages." *Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860.

## A. Defendant Tidquist

Defendant Tidquist was Northern's advanced practice nurse prescriber for a large part of the events in this case. Northern contends that medical staff, including Tidquist, failed to adequately treat his pain for most of the time he was under Tidquist's care, from October 2016 to May 2018, with only a short period in January and February 2018 when he received Tylenol.

Defendants argue that Northern did not complain to Tidquist about chest pain or headaches until his April 2018 appointment with her, at which point she prescribed him metoprolol in an effort to treat the underlying hypertension, and thus help his pain as well.

But Northern disputes defendants' assertion that he didn't raise his pain concerns with Tidquist until then. Northern states that he told Tidquist about his chest pain and severe headaches in October 2016, April 2017, and September 2017 meetings with Tidquist as well, with Tidquist failing to do anything to directly treat his pain. There was also the July 2017 incident in which Northern states that he was in severe pain from a "cardiac event" that defendant Kostohryz concluded was chest wall pain. Kostohryz consulted with Tidquist, who increased Northern's amlodipine to treat his underlying hypertension. So for purposes of summary judgment I will credit Northern's assertions that Tidquist knew about his chest and head pain well before April 2018, yet didn't provide him with pain medication.

Defendants argue that Tidquist did not consciously disregard Northern's pain because her and others' efforts to treat his underlying hypertension also served as efforts to treat his underlying pain. But medical providers can violate the Eighth Amendment by "persist[ing] in a course of treatment known to be ineffective." *Petties v. Carter*, 836 F.3d 722, 729–30 (7th Cir. 2016). Northern states that Tidquist was aware of his head and chest pain for more than a year before he received any medication directly for his pain (and even then not from Tidquist), and he didn't receive longer-term pain treatment until Dr. Liu took over his case in May 2018. A reasonable jury could find that Tidquist's efforts to adjust his blood pressure medication was not an effective treatment to treat Northern's longstanding pain problems. So I will deny defendants' motion for summary judgment on Northern's claim against Tidquist. For the same reasons I will deny their motion for summary judgment on his medical negligence claim against Tidquist.

11

**B. Defendants Kostohryz and Hentz**

Defendant nurses Kostohryz and Hentz both interacted with Northern during the July 17 incident in which Northern states that he languished in severe pain for about 15 hours. Northern states that Hentz initially responded to his complaint of severe pain by telling him to lie down and wait for the HSU to open, and that Kostohryz later evaluated him and concluded he was suffering from chest wall pain. Kostohryz says that she believed that medication from the canteen would be enough for his pain.

Northern's statement that Hentz did nothing to get him treatment for his pain is enough for a reasonable jury to find that she disregarded his pain. So I will deny defendants' motion for summary judgment on that part of Northern's claims.

As for Kostohryz's response, Northern points out that under DOC regulations, medical staff shouldn't wait for a prisoner to get needed medications from the canteen. *See* DAI Policy No. 309.52.01 ("Health care providers will not delay needed OTC medications by directing inmates to the canteen."). A violation of prison policy by itself does not necessarily violate the Constitution, *Langston v. Peters*, 100 F.3d 1235, 1238 (7th Cir. 1996). But there is no indication that Kostohryz knew that Northern would indeed be able to afford pain relievers from the canteen. A reasonable jury could find that Kostohryz ignored Northern's complaints of pain or at least was negligent in treating it. So I will deny defendants' motion for summary judgment on that part of Northern's claims.

Northern also states that after this event, over the next few months he was seen regularly by Hentz or Kostohryz for blood pressure monitoring and continued to complin about severe pain, but they did nothing to treat it, stating only that he would soon be seen by Tidquist. Similarly, in June 2018, Northern states that Hentz brushed off his complaints of chest pain

12

and headaches. It is undisputed that DOC nurses cannot formally prescribe drugs, but they do have the authority to give prisoners over-the-counter medications such as Tylenol or ibuprofen on a short-term basis. Indeed, this is what appears to have occurred in January and February 2018 when Northern was given three bottles of Tylenol. Because a reasonable jury could find that Hentz and Kostohryz disregarded Northern's pain during the periods he complained to them, I will deny defendants' motion for summary judgment on that part of Northern's claims.

**C. Defendant Maassen**

I granted Northern leave to proceed on Eighth Amendment and negligence claims against HSU supervisor Maassen for failing to train her staff or turning a blind eye to a pattern of similar misconduct that harmed prisoners. But Northern does not show that Maassen made specific training decisions leading to any of the outcomes here or that there was a pattern of misconduct directly related to the inadequate treatment that Northern alleges in this case. He has noted delays in a series of appointments but those delays don't seem to have anything to do with the various defendants' decisions not to provide Northern with better pain treatment. Maassen cannot be held liable merely for being a manager, and in any event she did not supervise advanced practitioner Tidquist. I will grant defendants' motion for summary judgment on Northern's claims against Maassen.

CONCLUSION

This case will proceed to trial on Northern's Eighth Amendment and Wisconsin-law medical negligence claims against defendants Tidquist, Hentz, and Kostohryz regarding inadequate medical care for his head and chest pain. I will direct the clerk of court to set a

telephone conference before Magistrate Judge Stephen Crocker to set a new trial date and associated deadlines regarding pretrial filings.

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 21, is DENIED in part as discussed in the opinion above.

2. Defendant Maassen is DISMISSED from the case.

3. The clerk of court is directed to set a telephone conference before Magistrate Judge Stephen Crocker to set the schedule for the remainder of the proceedings in this lawsuit.

Entered March 29, 2023.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge